**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.                                                                  No. 04-4282

WELDON ANGELOS,

      Defendant-Appellant.
_____

GEORGE M. ANDERSON;
RUSSELL T. BAKER, JR.;
DONALD L. BECKNER;
GRIFFIN B. BELL; HAROLD
J. BENDER; THOMAS K. BERG;
REBECCA A. BETTS; JAMES S.
BRADY; JAMES R. BRITTON;
B. MAHLON BROWN, III; BUCK
BUCHANAN; WAYNE A. BUDD;
DAVID B. BUKEY; ROBERT C.
BUNDY; WILLIAM R. BURKETT;
A. BATES BUTLER, III; MARK W.
BUYCK, JR.; EDWARD N. CAHN;
J. A. TONY CANALES; DAVID J.
CANNON; ZACHARY W. CARTER;
JIM R. CARRIGAN; ROBERT J.
CINDRICH; BENJAMIN R.
CIVILETTI; CHARLES CLARK;
ROBERT J. CLEARY; W. J. MICHAEL
CODY; KENDALL COFFEY; JANICE
MCKENZIE COLE; VERONICA F.
COLEMAN-DAVIS; JAMES F.
COMPANION; WILLIAM B.
CUMMINGS; MARGARET E.
CURRAN; E. BART DANIEL;
JOHN G. DAVIES; ROBERT J.

DEL TUFO; MICHAEL H. DETTMER; JOSEPH E. DIGENOVA; W. THOMAS DILLARD; HARRY D. DIXON, JR.; EDWARD L. DOWD, JR.; RONALD F. EDERER; JOHN S. EDWARDS; EDGAR W. ENNIS, JR.; ROBERT B. FISKE, JR.; J. DON FOSTER; DANIEL J. FRENCH; SUSAN GETZENDANNER; JOHN J. GIBBONS; JONATHAN L. GOLDSTEIN; TONY M. GRAHAM; CHARLES E. GRAVES; SAUL A. GREEN; DAVID WARNER HAGEN; HAL D. HARDIN; JO ANN HARRIS; FREDERICK J. HESS; STEPHEN B. HIGGINS; ROGER HILFIGER; ROSCOE C. HOWARD, JR.; JAMES A. HURD, JR.; GUY G. HURLBUTT; JOHN M. IMEL; BRIAN A. JACKSON; THOMAS PENFIELD JACKSON; J. ALAN JOHNSON; JAMES E. JOHNSON; GAYNELLE G. JONES; NATHANIEL R. JONES; DAVID J. JORDAN; NICHOLAS deB. KATZENBACH; J. RANSDELL KEENE; JOHN J. KELLY; W.A. KIMBROUGH, JR.; JOHN E. LAMP; SCOTT R. LASSAR; GEORGE N. LEIGHTON; STEPHEN C. LEWIS; TIMOTHY K. LEWIS; SIDNEY I. LEZAK; WILLIAM J. LOCKHART; MARTIN F. LOUGHLIN; ANDREW J. MALONEY; THOMAS J. MARONEY; JOHN S. MARTIN, JR.; SHERRY S. MATTEUCCI; TED L. MCBRIDE; JAY P. MCCLOSKEY; A. MELVIN MCDONALD; EDWARD B. MCDONOUGH, JR.; FRANK J. MCGARR; PATRICK M. MCLAUGHLIN; H. CURTIS MEANOR; KENNETH J. MIGHELL;

ABNER J. MIKVA; IRVIN B. NATHAN; JAMES F. NEAL; WILLIAM A. NORRIS; K. WILLIAM O'CONNOR; DENISE O'DONNELL; JOHN O. OLSON; JEROME F. O'NEILL; STEPHEN M. ORLOFSKY; A. JOHN PAPPALARDO; ROBERT M. PARKER; LARRY D. PATTON; TERRY L. PECHOTA; LAYN R. PHILLIPS; HAROLD J. PICKERSTEIN; RICHARD J. POCKER; SAM C. POINTER, JR.; GEORGE C. PRATT; WILLIAM S. PRICE; JOHN W. RALEY, JR.; RONALD S. REED, JR.; RONALD L. RENCHER; CHARLES B. RENFREW; JANET RENO; JAMES H. REYNOLDS; JAMES G. RICHMOND; JOSE DE JESUS RIVERA; WILLIAM W. ROBERTSON; JAMES K. ROBINSON; JAMES A. ROLFE; BENITO ROMANO; RICHARD A. ROSSMAN; STANLEY J. ROSZKOWSKI; ROBERT J. ROTH; JOSEPH RUSSONIELLO; ROBERT W. RUST; STEPHEN H. SACHS; H. LEE SAROKIN; DAVID M. SATZ, JR.; CARL SCHNEE; WILLIAM S. SESSIONS; ABRAHAM D. SOFAER; HENRY L. SOLANO; MICHAEL R. SPAAN; DONALD K. STERN; HERBERT J. STERN; JOHN W. STOKES, JR.; J. PRESTON STROM, JR.; THOMAS P. SULLIVAN; FREDERICK W. THIEMAN PAUL R. THOMSON, JR.; VICTORIA TOENSING; STANLEY A. TWARDY, JR.; PETER F. VAIRA; PATRICIA M. WALD; ATLEE W. WAMPLER, III EDWARD G. WARIN; JAMES J. WEST; PAUL L. WESTBERG; DANIEL

E. WHERRY; GEORGE W. WHITE; JOSEPH M. WHITTLE; FRANCIS M. WIKSTROM; WILLIAM D. WILMOTH; ALFRED WOLIN; RONALD G. WOODS; BOB WORTHAM; SHARON J. ZEALEY; DONALD E. ZIEGLER,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
(D.C. No. 02-CR-708 PGC)**

---

Robert A. Lund, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the briefs), District of Utah, Salt Lake City, UT, for Plaintiff-Appellee.

Jerome H. Mooney, Mooney Law Firm, Salt Lake City, UT; Erik Luna, Salt Lake City, UT, attorneys for Defendant-Appellant.

Jeffrey B. Sklaroff and Harry H. Rimm, Greenberg Traurig, New York, NY, filed a brief on behalf of Amici Curiae.

---

Before **BRISCOE, ANDERSON** and **O'BRIEN,** Circuit Judges.

---

**BRISCOE**, Circuit Judge

Defendant Weldon Angelos was convicted of multiple drug, firearms, and money laundering offenses and sentenced to a term of imprisonment of fifty-five years and one day. Angelos now appeals his convictions and sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

In May and June of 2002, the government, with the assistance of a confidential

informant (CI), conducted three controlled purchases of marijuana from Angelos. On

each of the three occasions, the CI purchased eight ounces of marijuana from Angelos in

exchange for cash. On two of the three occasions, the CI observed Angelos in possession

of a 10 millimeter Glock pistol.

Angelos's involvement in the three controlled purchases led to his indictment by a

federal grand jury on November 13, 2002. The indictment charged Angelos with three

counts of marijuana distribution in violation of 21 U.S.C. § 841(a)(1), one count of

carrying or possessing a firearm during or in relation to a drug trafficking crime in

violation of 18 U.S.C. § 924(c), and one count of possessing a firearm with an obliterated

serial number in violation of 18 U.S.C. § 922(k).

Angelos was subsequently arrested on November 15, 2002. A consensual search

of Angelos's apartment produced three pounds of marijuana, three firearms, a large

amount of cash, and two opiate suckers. A subsequent search at a house leased by

Angelos produced, among other things, additional marijuana and several large duffle bags

that contained marijuana residue.

On June 18, 2003, the government obtained a superseding indictment charging

Angelos with seventeen criminal counts, including additional marijuana distribution

counts and additional § 924(c) counts. On October 1, 2003, following the completion of a

criminal investigation by the Internal Revenue Service, the government obtained a second

superseding indictment charging Angelos with twenty criminal counts, including: six counts of distributing marijuana in violation of 21 U.S.C. § 841(a)(1) (Counts 1, 3, 5, 9, 13, 15); five counts of possessing a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Counts 2, 4, 10, 14, 16); two counts of possessing a stolen firearm in violation of 18 U.S.C. § 922(j) (Counts 6, 11); one count of possessing a firearm which had the importer's and manufacturer's serial number removed, obliterated and altered, in violation of 18 U.S.C. § 922(k) (Count 7); three counts of possessing a firearm while being an unlawful user of controlled substances in violation of 18 U.S.C. § 922(g)(3) (Counts 8, 12, 17); one count of engaging in and attempting to engage in a monetary transaction through or to a financial institution in criminally derived property in violation of 18 U.S.C. § 1957 (Count 18); and two counts of conducting and attempting to conduct financial transactions which involved the proceeds of marijuana distribution in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Counts 19, 20).

The case proceeded to trial in December 2003, where a jury found Angelos guilty of sixteen counts, including three § 924(c) counts. Following trial, a presentence investigation report (PSR) was prepared which recommended that Angelos, who had no prior adult criminal history, be sentenced to a term of imprisonment of sixty-one and a half (61.5) years, including six and a half (6.5) years for the drug and money laundering convictions and fifty-five (55) years for the three § 924(c) convictions. After receiving the PSR, the district court expressed concern about imposing what it characterized as "an

extraordinarily long prison term," and thus directed the parties to file briefs addressing a number of sentencing-related issues, including whether the mandatory minimum sentences required under § 924(c) were consistent with the Eighth Amendment's prohibition against cruel and unusual punishment. App. at 106. Angelos argued in response that the fifty-five year sentence required to be imposed under § 924(c) violated the Eighth Amendment's prohibition against cruel and unusual punishment. Angelos also asserted an Equal Protection challenge to § 924(c).

On November 16, 2004, the district court sentenced Angelos to a term of imprisonment of fifty-five years and one day. In doing so, the district court rejected Angelos's Eighth Amendment and Equal Protection challenges to his sentence.

II.

*Denial of motion to suppress*

On December 16, 2002, Chelsea Davenport, Angelos's former girlfriend, advised law enforcement agents that Angelos was hiding drugs, firearms, and money at a rental house located at 1701 East Fort Union Boulevard (the Fort Union house) in Salt Lake City. App. at 35-36. In particular, Davenport advised that she had observed marijuana in the trunk of a black BMW automobile parked in the garage at the Fort Union house (the same BMW that Angelos was observed driving when he sold marijuana to the CI), and that additional drugs, guns, and money were located in a safe in the basement of the Fort Union house. Id. Based upon this information, Federal Bureau of Investigation (FBI) agent Juan Becerra prepared an affidavit in support of a search warrant for the Fort Union

house and the BMW. Id. at 35-38. In the affidavit, Becerra stated:

> Your Affiant desires to seize the safe belonging to Angelos, [and] the black
> 1993 BMW 318I used during the sale of drugs to [the CI]. Your Affiant
> also requests permission to seize any drug paraphernalia, illegal narcotics,
> any proceeds derived from these activities, any photographs, video tapes or
> other items pertaining to the sale and distribution of illegal narcotics and
> street gang affiliation and activities.

Id. at 37. Consistent with the practice in the District of Utah, Becerra presented his

affidavit to an Assistant United States Attorney (AUSA) for preparation of an application

for a search warrant and a proposed search warrant. Unlike the broader language

contained in Becerra's affidavit, both the application and the proposed search warrant

prepared by the AUSA requested permission to seize only "[m]arijuana and other indicia

of narcotics in the trunk of the vehicle, 1993 BMW 318i, License Plate #215J3" and the

"personal safe located in the basement of the residence containing drugs, firearms, and

money." Id. at 34, 40. The proposed search warrant was subsequently signed by a

federal judge.

When law enforcement officers executed the search warrant, they first conducted a

protective sweep of all three floors of the Fort Union house in order to ensure their safety.

Upon entering the basement, the officers immediately detected a strong odor of raw

marijuana. The odor seemed to be emanating from approximately eighteen large duffle

bags that were in plain view. When the officers looked more closely at the duffle bags,

they observed small amounts of marijuana residue on the exterior of the bags.

Accordingly, the officers seized those bags. Six similar duffle bags, that also smelled of

raw marijuana, were located in plain view in the garage of the Fort Union house and seized by the officers. In addition to seizing the duffle bags and the items specifically listed in the search warrant (i.e., narcotics from the trunk of the BMW and the safe located in the basement), the officers executing the warrant seized numerous other items from throughout the Fort Union house, including firearms, documents, ammunition, a computer, gang-related clothing, and electronic scales.

Angelos moved to suppress the items seized from the Fort Union house. After conducting an evidentiary hearing, the district court denied Angelos's motion. On appeal, Angelos contends the district court erred in denying his motion to suppress. In reviewing the district court's decision, we "view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir. 2004).

*a) Exceeding scope of search warrant*

Angelos contends, as he did below, that the agents executing the search warrant exceeded the scope of the warrant by seizing items other than those specifically listed in the warrant. In ruling on Angelos's motion to suppress, the district court agreed "that the search warrant itself authorized only a search of the safe and the car," and did not extend to the Fort Union house as a whole. App. at 101. However, the district court concluded that "it was objectively reasonable for the [executing] officers to believe that the warrant authorized them to search the entire residence." Id. In reaching this conclusion, the

-9-

district court noted that "the officers specifically sought a warrant to obtain the items specified in Special Agent Becerra's affidavit, which plainly established probable cause to search not just the basement for the safe but the entire residence." Id. Further, the district court noted that "the warrant twice generally stated the location of the search as the 'residence/premises: 1701 East Fort Union Blvd, Salt Lake City, Utah 84121," and "also referred to the affidavit as the basis for probable cause." Id. These references, the district court concluded, could have led Becerra to reasonably believe that the "warrant authorized him to search the entire residence." Id. In sum, the district court concluded "it was objectively reasonable for the agents to think (and that they did in fact think) that they had obtained a search warrant to search the entire residence." Id.

"[T]he Fourth Amendment requires search warrants to 'particularly describ[e] the place to be searched, and the persons or things to be seized . . . .'" Katoa, 379 F.3d at 1207 (quoting Fourth Amendment). The warrant at issue here met the Fourth Amendment's particularity requirement by specifying the items to be seized from the Fort Union house, i.e., "[m]arijuana and other indicia of narcotics in the trunk of the vehicle, 1993 BMW 318i, License Plate #215J3" and the "personal safe located in the basement of the residence containing drugs, firearms, and money." App. at 34, 40. Further, the warrant, on its face, contained no constitutional or clerical defects, and there was no ambiguity in the terms used in the warrant.

That leads to the question of the precise scope of the warrant. We review de novo the scope of the search warrant at issue, employing "a standard of practical accuracy

rather than technical precision." United States v. Ortega-Jiminez, 232 F.3d 1325, 1328 (10th Cir. 2000) (internal quotation marks omitted). Although the district court concluded that the scope of the warrant was limited to the specific items listed on its face (i.e., the narcotics in the trunk of the BMW and the safe located in the basement), the government contends that the scope of the warrant included the entire Fort Union house. More specifically, the government asserts that we should adopt "a practical reading of the warrant" and, in doing so, should allow the warrant to be clarified by the supporting affidavit. Govt. Br. at 84.

In support of its arguments, the government cites to a single case, i.e., Ortega-Jiminez. In that case, law enforcement officers obtained a search warrant that authorized the search of a storage unit and any "persons and vehicles of individuals present and arriving" at the unit. 232 F.3d at 1328. In executing the warrant, the officers searched the person and vehicle of the defendant, who had been detained by authorities and brought to the storage unit prior to the warrant being issued. The district court, pursuant to the defendant's motion, suppressed the evidence seized from the defendant and his vehicle, concluding the defendant could not fairly have been considered "present" at the storage unit because he had been moved there by the police. On appeal, we noted that the term "present," as used in the search warrant, "might technically be interpreted to mean those who are voluntarily present at the time the warrant is signed . . . ." Id. at 1329. However, we concluded it was appropriate to "determine the *practical* meaning of the term . . . ." Id. (italics in original). In doing so, we turned to the affidavit submitted in

-11-

support of the warrant, which clearly indicated that the defendant was being detained at the storage unit. In light of this information, we held that "[a] practical reading of the term 'present' must include those the judge knew actually were present at that time," and thus the search of the defendant and his vehicle fell "within the scope of the warrant." Id.

Although Ortega-Jiminez allows a court to adopt a "practical reading" of a disputed term in a search warrant, it is clear that there are no such terms in the search warrant at issue here. To the contrary, as noted, the warrant describes with particularity, and without ambiguity, the items to be seized from the Fort Union home. Thus, we conclude that none of the terms in the warrant can be read "with practicality" to encompass the entire premises.

That conclusion, in turn, requires us to decide whether the officers executing the warrant acted reasonably in exceeding the scope of the warrant and seizing items throughout the house. Although the government makes reference to the good faith exception announced by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984), we conclude that exception is inapplicable here. In Leon, the Court held that evidence obtained pursuant to a constitutionally defective search warrant is admissible at trial if the officers executing the search warrant reasonably relied on the warrant and there is no evidence the officers mislead the magistrate issuing the warrant. Id. at 920-21. Notably, the Court in Leon made reference to officers "properly execut[ing] [a] warrant and search[ing] only those places and for those objects that it was reasonable to believe were covered by the warrant." 468 U.S. at 918, n.19. In turn, we have held that "[t]he

-12-

Leon good faith exception will not save an improperly executed warrant." United States v. Rowland, 145 F.3d 1194, 1208 n.10 (10th Cir. 1998). Given the circumstances of the search of the Fort Union house, it is apparent that the problem lies in the execution, and not the constitutionality, of the search warrant.

Angelos contends there are only two possible explanations for why the officers in this case exceeded the scope of the search warrant: either they "knew the limits of the warrant and decided to disregard them, or [they] never bothered to read the warrant itself." Aplt. Br. at 76. Either way, he argues, the officers are not entitled to rely on any type of good faith exception. We agree. Assuming the agents executing the warrant actually read it, they reasonably should have noticed its limited scope. In turn, the agents could have, upon realizing that the scope of the warrant was narrower than requested by Agent Becerra, contacted the issuing judge by phone in an attempt to receive authorization to expand the scope of the search to include the entire premises. See Katoa, 379 F.3d at 1208 (upholding search as reasonable where officers executing search, upon realizing that the warrant contained a defect or omission, made immediate contact with the issuing magistrate, received authorization for their actions, and the judge signed the warrant upon the officers' return). By failing to do so, the officers cannot be said to have acted reasonably.

That leaves only the question of what evidence should have been suppressed. Angelos contends that the proper remedy for the Fourth Amendment violation in this case is suppression of all the evidence seized by the officers, and not just the evidence that

-13-

exceeded the scope of the warrant. Aplt. Br. at 74. He does not, however, provide any authority to support this remedy. In the absence of such authority, we conclude that only the seized evidence that exceeded the scope of the search warrant, and that was not covered by the plain smell/view exception, should have been suppressed. See generally United States v. Harris, 313 F.3d 1228, 1233 (10th Cir. 2002) (noting the general rule that "[a]ny evidence obtained as a result of an illegal search and seizure is subject to the exclusionary rule--i.e., the evidence cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").

*b) Plain smell exception*

Angelos contends the district court erred in refusing to suppress the group of duffle bags that were seized by officers from the basement and garage of the Fort Union house due to the smell of raw marijuana emanating from them. Angelos does not deny that the officers smelled raw marijuana coming from the duffle bags. Instead, Angelos argues that, because the officers secured the house by performing a protective sweep, "[t]here was no exigent circumstance for [them] to rummage through the basement and garage in an attempt to locate the source of the smell." Aplt. Br. at 81.

We disagree. The "plain view" doctrine allows a law enforcement officer to seize evidence of a crime, without violating the Fourth Amendment, if "(1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful right of

-14-

access to the object." United States v. Thomas, 372 F.3d 1173, 1178 (10th Cir. 2004); see Horton v. California, 496 U.S. 128, 136-37 (1990). "The 'plain smell' doctrine," in turn, "is simply a logical extension of the 'plain view' doctrine . . . ." App. at 102; e.g., United States v. Rhiger, 315 F.3d 1283, 1290 (10th Cir. 2003) (concluding that various factors, including agents' detection of strong odor of cooking methamphetamine, justified warrantless search); United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000) (concluding that officer executing arrest warrant "quickly developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production"); United States v. Haley, 669 F.2d 201, 203 (4th Cir. 1982) (concluding that the odor given off by a container can justify invocation of the "plain view" doctrine). Here, the district court found, and Angelos does not dispute, that the officers executing the search warrant (1) were lawfully in the Fort Union house, (2) had lawful authority to conduct a protective sweep of the entire premises, including the garage and basement[1], (3) smelled a strong odor of raw marijuana coming from duffle bags in the basement and garage, all of which were in plain sight, and (4) observed residue of marijuana on the duffle bags in the basement. We conclude these circumstances, considered together, clearly justified the seizure of the duffle bags.[2]

_____

[1] Although Angelos contends a protective sweep is justified only pursuant to an arrest, we have previously upheld a search where the officers conducted a protective sweep of a house which was the subject of a search warrant. See United States v. King, 222 F.3d 1280, 1283 (10th Cir. 2000).

[2] In its appellate brief, the government argues that several other items, including a rifle, surveillance equipment, body armor, and booby traps "were all discovered and

-15-

*c) Was admission of the suppressible evidence harmless?*

The government contends that, even if some of the evidence seized from the Fort Union house should have been suppressed, its admission at trial was harmless. Because the error was of constitutional magnitude, we apply the harmless error standard outlined in Chapman v. California, 386 U.S. 18 (1967). See United States v. Fellers, 397 F.3d 1090, 1098 (8th Cir. 2005). The Chapman standard requires the government to demonstrate that the error was "harmless beyond a reasonable doubt." 386 U.S. at 24.

After carefully reviewing the record on appeal, including the trial transcript, we agree with the government that the admission of evidence improperly seized during the search of the Fort Union house was harmless beyond a reasonable doubt. To begin with, we note that the jury acquitted Angelos on three charges arising out of certain items seized at the Fort Union house: a handgun and a rifle, which formed the basis for two § 924(c) charges (Counts 14 and 16 of the second superseding indictment); and marijuana found in the Fort Union house, which formed the basis of a charge of possessing with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count 15 of the second superseding indictment). The only count of conviction directly arising out of the search of the Fort Union house was Count 13 of the second superseding indictment, which

---

seized because they were in plain view of the officers." Govt. Br. at 88. We conclude it is unnecessary to address these arguments in detail, given the strength of the government's evidence underlying the offenses of conviction. In other words, even assuming these items were not properly seized under the plain view doctrine and should have been suppressed, we conclude their introduction at trial was harmless beyond a reasonable doubt.

charged Angelos with possessing with intent to distribute marijuana located in the trunk of the black BMW parked in the garage of the Fort Union house. As outlined above, the search warrant for the Fort Union house specifically listed, as an item to be seized, the marijuana in the trunk of the BMW. Thus, we find no basis for concluding that this conviction was tainted by introduction of any improperly seized evidence.

It is true that the jury also found Angelos guilty of Count 20 of the second superseding indictment, which charged him with violating 18 U.S.C. § 1956(a)(1)(A)(i) in December 2002 by paying rent for the Fort Union house with proceeds of marijuana distribution with the intent to use the Fort Union house to "store marijuana, cash, and other items related to the distribution of and possession with intent to distribute marijuana . . . ." App. at 23. Our review of the record on appeal, however, leads us to conclude that the properly admitted evidence in support of this conviction was so substantial "that it assured beyond a reasonable doubt that the jury would have returned a conviction even absent" any improperly admitted evidence. Fellers, 397 F.3d at 1099. For example, Angelos's former girlfriend, Chelsea Davenport, testified that she personally observed Angelos sell marijuana on a daily basis, and that Angelos sometimes did so at the Fort Union house. Davenport further testified that, on one occasion, she traveled with Angelos and two other individuals to California and returned to Salt Lake City with a trunkload of duffel bags containing marijuana. Eric Lerohl, an FBI agent who was involved in the search of the Fort Union house, testified that the entire house emitted a very distinct odor of raw marijuana. Together, the testimony of Davenport and Lerohl was more than ample

to have allowed the jury to reasonably conclude that the duffle bags seized during the search of the Fort Union house, which smelled of raw marijuana and contained marijuana residue, were the same duffle bags used by Angelos to transport marijuana from California to Salt Lake City. In light of this evidence, the admission of any items improperly seized from the Fort Union house was merely cumulative and, in our view, harmless. In other words, any improperly seized evidence was not critical to the jury's finding that Angelos utilized the Fort Union house for his marijuana-trafficking activities.

Lastly, we conclude that the evidence in support of Angelos's remaining convictions was so substantial that it rendered harmless the admission of any evidence improperly seized from the Fort Union house. In particular, we note that the evidence in support of Angelos's § 924(c) convictions was overwhelming. The first two of those convictions were tied to Angelos's possession of a 10 millimeter Glock pistol during the first and second controlled purchases. At trial, the CI testified that during the first controlled purchase Angelos had the pistol tucked between the front seats of his vehicle, and during the second controlled purchase was wearing the pistol in an ankle holster. Sergeant Mazuran in turn testified that the CI reported these same observations immediately following each of the first two controlled purchases. Christopher Maez and Scott Hansen, deputies with the Salt Lake County Sheriff's Office, testified that on July 10, 2002, they responded to a fight involving Angelos and, during the course of investigating the incident, seized a 10 millimeter Glock pistol that Angelos was wearing in an ankle holster. Lastly, Chelsea Davenport, Angelos's former girlfriend, testified that,

during the course of their relationship, Angelos consistently carried a black gun in an ankle holster, particularly when selling drugs. Together, this evidence overwhelmingly supported the jury's findings that Angelos knowingly carried and possessed the pistol during the first and second controlled purchases. Angelos's third § 924(c) conviction was based upon three weapons seized during the post-arrest search of his apartment. Notably, Angelos does not dispute that he possessed those weapons. Nor does he seriously dispute that he used that apartment for the distribution of drugs. Thus, we conclude that the admission of evidence improperly seized from the Fort Union house was harmless with respect to this final § 924(c) conviction.

*District court's refusal to admit police reports*

Angelos contends the district court erred in refusing to admit contemporaneous law enforcement reports of the first two controlled purchases. Although Angelos was charged with and convicted of possessing a firearm during those first two transactions, Angelos asserts that the contemporaneous law enforcement reports of those two transactions contained no mention of a firearm and thus were relevant and admissible. We review a district court's evidentiary rulings for abuse of discretion. United States v. Montague, 421 F.3d 1099, 1101 (10th Cir. 2005). Under that standard, we will reverse "only for a clearly erroneous finding of fact or an erroneous conclusion of law or . . . a clear error in judgment." Id. at 1102 (internal quotation marks omitted).

At trial, the law enforcement officer who drafted the contemporaneous reports, Sergeant Mazuran, testified on direct examination that, immediately following the first

two transactions, the CI reported observing Angelos in possession of a gun (the CI likewise testified to the same thing). On cross-examination by Angelos's counsel, Mazuran admitted that he failed to include this information in the contemporaneous reports he prepared. In light of Mazuran's testimony, the admission of the reports themselves would have been only cumulative. Indeed, at one point during the trial, Angelos's counsel, in response to the district court's question whether he was seeking to admit the reports, stated that he wanted the reports admitted but did not want them to go to the jury. Aplee. App. at 569. Although Angelos's counsel subsequently changed his mind and asked for the reports to be admitted, the district court rejected that request and Angelos's counsel made no attempt to explain why the reports were admissible or to question the district court's ruling. Accordingly, we conclude the district court did not abuse its discretion in refusing to admit the reports.

*Eighth Amendment challenge to Angelos's sentences*

Angelos, joined in an amicus brief filed by a group of individuals, including former federal judges, United States Attorneys General, and high-ranking United States Department of Justice officials, contends the district court erred in concluding that the fifty-five year sentence mandated in his case by § 924(c) did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. We review de novo the question of whether a criminal sentence violates the Eighth Amendment. E.g., United States v. Fernandez, 388 F.3d 1199, 1258 (9th Cir. 2004); United States v. Myers, 280 F.3d 407, 416 (4th Cir. 2002).

"The Eighth Amendment . . . contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" Ewing v. California, 538 U.S. 11, 20 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991)). Under this narrow proportionality principle, the Eighth Amendment "does not require strict proportionality between crime and sentence." Id. at 23. "Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Id. (quoting Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in the judgment)).

Although the Supreme Court has reviewed Eighth Amendment challenges to a number of state and federal sentences, it has struck down only two of them over the past century. In Weems v. United States, 217 U.S. 349, 367 (1910), the Court invalidated under the Eighth Amendment a sentence of fifteen years in chains and at hard labor, plus permanent surveillance and civil disabilities, for the crime of falsifying a public document. Seventy-three years later, in Solem v. Helm, 463 U.S. 277 (1983), the Court invalidated under the Eighth Amendment a sentence of life imprisonment without the possibility of parole imposed under South Dakota law against a nonviolent recidivist whose final crime was writing a "no account" check with the intent to defraud.

In contrast to these two cases, the Supreme Court has rejected Eighth Amendment challenges to the following sentences:

> • A life sentence, with the possibility of parole, under a Texas recidivist statute for successive convictions of (1) fraudulent use of a credit card to obtain $80 worth of goods or services, (2) passing a forged check in the amount of $28.36, and (3) obtaining $120.75 by false pretenses. Rummel v. Estelle, 445 U.S. 263, 285 (1980).

• A forty-year sentence for possession and distribution of 9 ounces of marijuana.  Hutto v. Davis, 454 U.S. 370, 375 (1982).

• A life sentence, without the possibility of parole, for possession of more than 650 grams of cocaine.  Harmelin, 501 U.S. at 1005.

• A twenty-five year to life sentence imposed under a California recidivist statute for the offense of felony grand theft (i.e., stealing three golf clubs worth approximately $1,200).  Ewing, 538 U.S. at 30-31.

• Two consecutive twenty-five-year to life sentences under a California recidivist statute for two counts of petty theft.  Lockyer v. Andrade, 538 U.S. 63, 77 (2003).

Considered together, these cases clearly support the Supreme Court's recent statement in Andrade that "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case."  538 U.S. at 76.

Applying these principles to the case at hand, we conclude that this is not an "extraordinary" case in which the sentences at issue are "grossly disproportionate" to the crimes for which they were imposed.  The Supreme Court has noted that the "basic purpose" of § 924(c) is "to combat the 'dangerous combination' of 'drugs and guns.'" Muscarello v. United States, 524 U.S. 125, 126 (1998) (quoting Smith v. United States, 508 U.S. 223, 240 (1993)).  The Court has also noted that "the provision's chief legislative sponsor . . . said that the provision seeks 'to persuade the man who is tempted to commit a Federal felony to leave his gun at home.'"  Id. (quoting 114 Cong. Rec. 22231 (1968) (Rep. Poff)).  In addition, the Court has concluded that it was entirely rational for Congress to penalize the mere presence of a firearm during a drug transaction: "Whether guns are used as the medium of exchange for drugs sold illegally or as a means

to protect the transaction or dealers, their introduction into the scene of drug transactions dramatically heightens the danger to society." Smith, 508 U.S. at 239 (internal quotation marks omitted). In this same vein, the Third Circuit has held that "[i]t is likely that Congress," in enacting § 924(c), "meant . . . to protect our communities from violent criminals who repeatedly demonstrate a willingness to employ deadly weapons by punishing them more harshly." United States v. Couch, 291 F.3d 251, 255 (3d Cir. 2002). In sum, the lengthy sentences mandated by § 924(c) were intended by Congress to (a) protect society by incapacitating those criminals who demonstrate a willingness to repeatedly engage in serious felonies while in possession of firearms, and (b) to deter criminals from possessing firearms during the course of certain felonies. Notably, both of these penological theories have been held by the Supreme Court to be valid and subject to deference by the courts. See Ewing, 538 U.S. at 24-28; Harmelin, 501 U.S. at 998-99.

Although Angelos attempts to downplay the nature of his crimes, the record on appeal clearly supports the jury's findings that Angelos possessed a handgun during the course of the first two controlled purchases, and likewise possessed firearms at his apartment in conjunction with drug-trafficking materials. All of these firearms appear to have facilitated his drug trafficking by, if nothing else, providing protection from purchasers and others. Although Angelos emphasizes that he never used any of the firearms, his possession of the firearms clearly heightened the threat of danger to society. In particular, it undoubtedly increased the likelihood of violence occurring to neighbors in and around the residences where the firearms were maintained, as well as to others that

-23-

happened to be in the vicinity of wherever he chose to conduct his drug transactions.

It is also important to note that Angelos's possession of firearms facilitated his possession and distribution of illegal drugs. In Harmelin, the Supreme Court emphasized the seriousness of drug trafficking crimes, noting that the "[p]ossession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" 501 U.S. at 1002 (quoting Treasury Employees v. Von Raab, 489 U.S. 656, 668 (1989)). In particular, "drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture." Id. at 1002. Thus, as in Harmelin, Angelos's "suggestion that his crime was nonviolent . . . is false to the point of absurdity." Id. at 1002. "To the contrary," his "crime[s] threatened to cause grave harm to society." Id.

Thus, Congress "could with reason conclude that the threat posed to the individual and society" by possessing firearms in connection with serious felonies, in particular drug-trafficking crimes, was "momentous enough to warrant the deterrence and retribution" of lengthy consecutive sentences, such as those imposed on Angelos in this case. Id. at 1003. In turn, that is enough to conclude that the sentences imposed on Angelos are not grossly disproportionate to his crimes. Id. at 1004 ("The severity of petitioner's crimes brings his [life sentence without parole] within the constitutional boundaries established by our prior decisions.").

-24-

The district court reached this same conclusion, but took a somewhat different route. The district court initially concluded that it was required to examine three "factors" first mentioned in Justice Powell's dissenting opinion in Davis, and subsequently discussed in Solem and Harmelin: "(1) the nature of the crime and its relation to the punishment imposed, (2) the punishment for other offenses in this jurisdiction, and (3) the punishment for similar offenses in other jurisdictions." App. at 175. Applying these factors, the district court concluded that "the 55-year enhancement" it was required to impose pursuant to § 924(c) was grossly disproportionate to the crimes committed by Angelos. Id. at 177. In support of this conclusion, the district court stated that Angelos "did not engage in force or violence, or threats of force or violence . . . ." Id. Further, the district court noted that, under the Sentencing Guidelines, the penalty for Angelos's "firearms conduct" would be "about 24 months . . . ." Id. With respect to the second "factor," the district court concluded that § 924(c) effectively treated Angelos "in the same manner as, or more severely than, criminals who have committed far more serious crimes." Id. at 178 (internal quotation marks omitted). With respect to the third factor, the district court concluded that Angelos's sentence under § 924(c) was "longer than he would receive in any of the fifty states." Id. In sum, the district court concluded that analysis of these three factors led "to the conclusion that . . . Angelos' sentence violate[d] the Eighth Amendment." Id. at 179. However, the district court concluded that the Supreme Court's decision in Davis prevented it from declaring Angelos's sentence violative of the Eighth Amendment. Id. More specifically, the district court noted that "if

40 years in prison for possessing nine ounces of marijuana d[id] not violate the Eighth Amendment, it [wa]s hard to see how 61 years [the sentence urged by the government in this case] for distributing sixteen ounces (or more) would do so." Id.

Angelos argues that the district court erred in concluding that the Supreme Court's decision in Davis remains good law and in turn concluding that the decision in Davis required the district court to reject Angelos's Eighth Amendment challenge to his sentence. The flaw in Angelos's argument is his assertion that Davis is no longer good law. Although the Court in Davis rejected application of the three-factor test later discussed in Solem and Harmelin, it is the ultimate holding in that case (i.e., that a forty-year sentence for a marijuana trafficking crime does not violate the Eighth Amendment) that remains important. Further, the Supreme Court has continued to recognize and discuss Davis anytime it has been faced with an Eighth Amendment challenge to a sentence – thereby clearly indicating that the holding in Davis remains "good law."

The amici "suggest that once [Harmelin's] three factor test has been satisfied, the analysis ends, and a finding that a sentence is unconstitutional under Harmelin is not inconsistent with Davis." This suggestion, however, is only partially correct. As noted in Hawkins v. Hargett, 200 F.3d 1279, 1282 (10th Cir. 1999), "Justice Kennedy's opinion in Harmelin . . . sets forth the applicable Eighth Amendment proportionality test." Under that test, a court first examines whether the sentence at issue is grossly disproportionate to the crime for which it was imposed. Id. If there is no gross disproportionality, that is the end of the analysis; only if gross disproportionality is found must a court "proceed to the

-26-

comparative analyses" of the second and third factors. Id.

Importantly, however, that does not change the outcome here because, for the reasons discussed in detail above, it is clear that the first, and controlling, "factor" in Harmelin, i.e., whether the sentence at issue is grossly disproportionate to the crime, has not been satisfied. Although the district court concluded that Angelos's sentence was disproportionate to his crimes, we disagree. In our view, the district court failed to accord proper deference to Congress's decision to severely punish criminals who repeatedly possess firearms in connection with drug-trafficking crimes, and erroneously downplayed the seriousness of Angelos's crimes. Although it is true that Angelos had no significant adult criminal history, that appears to have been the result of good fortune rather than Angelos's lack of involvement in criminal activity. The evidence presented by the government at trial clearly established that Angelos was a known gang member who had long used and sold illicit drugs. Further, the government's evidence established that, at the time of his arrest, Angelos was a mid-to-high drug dealer who purchased and in turn sold large quantities of marijuana. In addition, the government's evidence established that Angelos possessed and used a number of firearms, some stolen, to facilitate his drug-dealing acitivities. Lastly, the evidence established that although Angelos had some involvement in the music industry, he failed to financially profit from that involvement and indeed never reported any positive earnings to the Internal Revenue Service. Thus, the only reasonable inference that could be drawn was that Angelos's sole source of income was his drug-trafficking operations.

In sum, we conclude there is no merit to Angelos's Eighth Amendment challenge to his sentence under § 924(c).  See United States v. Beverly, 369 F.3d 516, 537 (6th Cir. 2003) (rejecting Eighth Amendment challenge to § 924(c) sentences and noting that "the Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment.").

*Equal Protection challenge to Angelos's sentence*s

Angelos also challenges his sentence on Equal Protection grounds, arguing that his sentence is the product of "an irrational legislative scheme that implicates the judicial branch's core duty of criminal sentencing and entails incomparable consequences for the individual defendant."  Aplt. Br. at 8.  We review constitutional challenges to a sentence de novo.  United States v. Eaton, 260 F.3d 1232, 1236 (10th Cir. 2001).

The parties in this case appear to agree that the appropriate level of scrutiny to be applied in resolving Angelos's Equal Protection claim is the rational basis test, since Angelos has not alleged a discriminatory intent on the part of Congress in enacting the mandatory minimum sentencing scheme outlined in § 924(c).  To pass muster under the rational basis test, § 924(c) must "have a legitimate purpose," and it must have been "reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose."  Western & Southern Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 668 (1981).

Section 924(c) easily survives the rational basis test.  As previously discussed, the

"basic purpose" of § 924(c) was "to combat the 'dangerous combination' of 'drugs and guns.'" Muscarello, 524 U.S. at 126. Clearly, this purpose is legitimate, given the recognized negative impact drugs and violence have upon society. Further, it was well within reason for Congress to believe that use of the mandatory minimum sentencing scheme outlined in § 924(c) would achieve this basic purpose by (a) incapacitating those criminals willing to possess firearms during drug-trafficking crimes, and (b) deterring other criminals from engaging in such dangerous conduct. See generally Chapman v. United States, 500 U.S. 453, 467 (1991) ("Congress has the power to define criminal punishments without giving the courts any sentencing discretion.").

*Alternative construction of § 924(c)*

Lastly, Angelos contends the district court could have avoided any constitutional problems by interpreting § 924(c) so as to treat his three marijuana distribution convictions as a "grouping of related acts," and in turn applying "only the 5-year mandatory minimum sentence under 18 U.S.C. § 924(c)(2)(A)(i)." Aplt. Br. at 63. Angelos's contention, however, finds no support in the language of § 924(c). Section 924(c) provides enhanced penalties for "any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . ." 18 U.S.C. § 924(c)(1)(A). Section 924(c) defines the term "drug trafficking crime" as "any felony punishable under the Controlled Substances Act . . , the Controlled Substances Import and Export Act . . , or the Maritime Drug Law

-29-

Enforcement Act . . . ." 18 U.S.C. § 924(c)(2). A defendant's first conviction under § 924(c) carries a mandatory minimum five-year sentence that must run consecutively to any other sentences. 18 U.S.C. § 924(c)(1)(A)(i). A second or subsequent conviction under § 924(c) carries a mandatory minimum twenty-five year sentence that must run consecutively to any other sentences. 18 U.S.C. § 924(c)(1)(C)(i). Here, it is undisputed that Angelos was convicted of three separate violations of § 924(c), each occurring on a different date, and each in connection with a separate "drug trafficking crime." In light of those three convictions, § 924(c) clearly mandated the imposition of a fifty-five year sentence (five years for the first conviction, and twenty-five years for the second and third convictions).

AFFIRMED.