**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JACOB T. WILFONG,

    Defendant-Appellant.

No. 05-6404

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CR-05-40-01-L)**

---

Submitted on the Briefs:

David Autry, Oklahoma City, Oklahoma, for Defendant-Appellant.

John C. Richter, United States Attorney; Randal A. Sengel, Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge

---

After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is, therefore, ordered submitted without oral argument.

Defendant Jacob Wilfong was convicted by a jury of conspiring to traffic in and use unauthorized access devices, in violation of 18 U.S.C. § 371, and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), and sentenced to a term of imprisonment of eighty-four months. Wilfong appeals only his sentence. He contends the court violated his Sixth Amendment rights by finding the amount of intended loss to be greater than that found by the jury. He also contends there was insufficient evidence for the court to find he was a "leader or organizer," or for the court to find he obstructed justice through reckless endangerment. Finally, he contends the court violated his Sixth Amendment rights when it calculated his criminal history score by relying on prior convictions, the existence of which were not found by the jury. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

*Factual background*

On January 5, 2005, police officers in Tulsa, Oklahoma, were dispatched to an electronics store in response to a call from the store's manager reporting that two individuals, a man and a woman, had attempted to purchase $1,200.00 worth of merchandise using a fake driver's license and credit card. When they arrived at the store, the police officers observed the suspects leave the store, get into a sport utility vehicle, and begin driving away. The officers initiated a stop of the vehicle. Although the female

-2-

driver of the vehicle stopped initially, she drove off at a high rate of speed when the officers got out of their patrol cars. A chase ensued, during which the female driver drove in a reckless fashion, and both the female driver and her male passenger threw papers out of the vehicle. Officers eventually stopped the suspects using "stop sticks" to blow out the tires of the suspects' vehicle. The two suspects, later identified as Wilfong and his girlfriend, Michelle Fischer, were arrested and their vehicle searched. Officers found inside the vehicle a laptop computer, two fraudulent Oklahoma driver's licenses, and twenty-seven sheets of paper with the names, dates of birth, and social security numbers for other individuals.

Subsequent investigation by law enforcement, including a search of the Oklahoma City residence shared by Wilfong and Fischer, revealed the following criminal scheme employed by Wilfong, Fischer, and their associates. Wilfong and Fischer would first drive through "nice" neighborhoods and write down the addresses of certain houses. Wilfong would then, using a password provided to Fischer by an employee of an Oklahoma City collection business, log onto an internet site where he could obtain personal information, including social security numbers and birthdates, of the persons living at the addresses they had earlier identified. Armed with this personal information, Wilfong produced fraudulent Oklahoma driver's licenses using computer equipment, a digital camera, a printer/scanner, and a laminator. Wilfong, Fischer, and several of their associates used the fraudulent driver's licenses to open accounts at local businesses, purchase merchandise on credit at those businesses, and then sell or trade the merchandise

to obtain money for drugs and living expenses.

*Procedural background*

On January 31, 2005, a criminal complaint was filed charging Wilfong and Fischer with violating 18 U.S.C. § 1028A(a)(1) by producing false identification documents and knowingly using without lawful authority a means of identification of another person. ROA, Vol. 1, Doc. 1. On March 1, 2005, a federal grand jury returned an indictment charging Wilfong, Fischer and six co-defendants with violating 18 U.S.C. § 371 by conspiring to traffic in and use unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2). Id., Doc. 32. The indictment also charged Wilfong and each of his co-defendants with a substantive count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

The case against Wilfong proceeded to trial on September 12, 2005. At the conclusion of all the evidence, the jury found Wilfong guilty as charged. A presentence investigation report (PSR) was prepared on October 17, 2005. Wilfong asserted various objections to the PSR, including its calculation of the amount of the intended loss, its conclusion that he qualified as a leader and organizer of the conspiracy, its proposed adjustment for reckless endangerment, and its calculation of his criminal history score. On December 13, 2005, the district court sentenced Wilfong to a term of imprisonment of eighty-four months (sixty months on the conspiracy conviction and twenty-four months on the identity theft conviction, with the two sentences to run consecutively). The district court overruled Wilfong's objections to the PSR.

II.

In his appeal, Wilfong asserts four challenges to the manner in which the district court calculated his sentence. We proceed to address, and ultimately reject, each of those challenges.

*A) Amount of intended loss*

Wilfong first contends the district court violated his Sixth Amendment rights by disregarding the jury's findings on the amount of intended loss and increasing his base offense level based upon its own findings regarding the amount of intended loss. We review de novo a defendant's constitutional challenge to his sentence. United States v. Angelos, 433 F.3d 738, 754 (10th Cir. 2006).

The verdict form employed by the district court asked the jury, in connection with its finding of guilt as to the conspiracy charge, to find "the dollar amount of anything of value [Wilfong] obtained or attempted to obtain." ROA, Vol. 1, Doc. 246 at 2. In answering this question, the jury checked the box that read "$30,001 to $70,000." Id. The PSR, however, calculated that Wilfong and his co-defendants had caused actual losses totaling $83,720.07, and intended losses totaling $151,680.06. Id., Vol. 6 at 9. This latter figure was arrived at by totaling the credit limits of each fraudulent account opened by Wilfong and his co-defendants. Wilfong objected to the PSR's calculations. The district court rejected Wilfong's objection, noting that the factual determination that the jury was asked to make was different than the determination at issue in the PSR and that, in any event, it was not bound by the jury's finding. Id., Vol. 3 at 272. In turn, the

district court, as recommended by the PSR, increased Wilfong's offense level by ten levels pursuant to U.S.S.G. § 2B1.1(b)(1)(F).

We conclude the district court did not err in making these challenged factual findings or in enhancing Wilfong's base offense level based upon these findings. As noted by the district court, the jury's findings focused exclusively on what amounted to actual loss, i.e., what the verdict form described as "the dollar amount of anything of value [Wilfong] obtained or attempted to obtain." ROA, Vol. 1, Doc. 246 at 2. In contrast, the district court's factual findings were made for purposes of applying U.S.S.G. § 2B1.1(b)(1). Significantly, the commentary to § 2B1.1 directs a district court to apply "the greater of actual loss or intended loss." Id., cmt., n. 3(A). Further, § 2B1.1 employs a broad definition of the term "intended loss," defining it to mean "the pecuniary harm that was intended to result from the offense," and "includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur . . . ." Id., cmt., n. 3(A)(ii). Thus, the district court's finding of the amount of intended loss was not necessarily inconsistent with the jury's verdict.

Moreover, it is clear that, in any event, the district court was not bound by the jury's findings for purposes of sentencing, and the district court's reliance on its own independent factual findings did not violate Wilfong's Sixth Amendment rights. As Wilfong acknowledges in his opening brief, we have expressly held that, even after the decision in United States v. Booker, 543 U.S. 220 (2005), "when a district court makes a determination of sentencing facts by a preponderance test under the now-advisory

-6-

Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard." United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005). Although Wilfong criticizes the holding in Magallanez, we are bound by that decision, absent en banc reconsideration. United States v. Foster, 104 F.3d 1228, 1229 (10th Cir. 1997).

*B) "Leader or organizer" enhancement*

Wilfong next contends the district court erred in imposing a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) based on its finding that he was a "leader and organizer of this conspiracy . . . ." ROA, Vol. 3 at 273. We review for clear error the district court's finding that Wilfong acted as a leader or organizer for purposes of § 3B1.1. United States v. Gonzalez Edeza, 359 F.3d 1246, 1248 (10th Cir. 2004). Under this standard, we "will not reverse [the] lower court's finding of fact simply because we would have decided the case differently." Id. (internal quotation marks omitted). Rather, we "ask whether, on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." Id. (internal quotation marks omitted).

Section 3B1.1 provides for varying "aggravating role" adjustments to a defendant's base offense level. In particular, subsection (a) requires a defendant's offense level to be increased "by 4 levels" if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a).

To qualify for an adjustment under [§ 3B1.1], the defendant must have been

the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1 , cmt. n. 2.

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

Id., cmt. n. 4.

In Wilfong's case, the district court, at sentencing, made the following factual findings to support its ultimate determination that Wilfong qualified as an "organizer or leader" of the conspiracy:

Mr. Wilfong, based upon the evidence that the Court heard, Mr. Wilfong and Ms. Fischer lived together, they were involved together in attempting to obtain merchandise when the police were called, and they fled in the high-speed chase, both throwing out numerous documents.
The Court would also note from the evidence that Mr. Wilfong – while Ms. Fischer and Mr. Wilfong had different areas of the conspiracy which they participated in as leaders, Mr. Wilfong was the one instrumental in providing all of the false documentation for the other members of the conspiracy to use in their obtaining merchandise fraudulently.  He wasn't merely an absent bystander, from any evidence that the Court heard, that was simply being used by Ms. Fischer, but they definitely worked together to create this identity-theft organization.

ROA, Vol. 3 at 273.

Notably, Wilfong does not dispute any of these underlying factual findings. Instead, Wilfong is simply challenging whether those underlying factual findings, considered together, support a determination that he was an organizer or leader for purposes of § 3B1.1(a). Although Wilfong acknowledges that these underlying factual findings establish that he "was an essential or important figure in the conspiracy," he argues that "[t]here was no finding that [he] exercised control over others involved in the scheme, or that he organized the scheme." Aplt. Br. at 29.

We reject Wilfong's arguments. The district court's underlying factual findings clearly indicate that Wilfong played an organizational role in the conspiracy by working with Fischer to identify addresses of potential victims, using those addresses to access personal information regarding the identified victims, using the illegally obtained information to create fake Oklahoma driver's licenses, and then either personally using those fake driver's licenses or distributing them to his co-conspirators to falsely obtain store credit, purchase merchandise, and then sell the merchandise for a profit. Although the district court did not specifically find that Wilfong organized or led his co-conspirators, it is clear that Wilfong exercised management responsibility over the critical property of the conspiracy (i.e., the fake Oklahoma driver's licenses), and shared with Fischer the critical decision-making authority in the conspiracy by identifying the specific victims of the conspiracy. Thus, at a minimum, Wilfong was properly subjected to an adjustment under § 3B1.1(a) for his role as an organizer in the conspiracy.

Wilfong also argues, in passing, that the Sixth Amendment required the jury to

make the underlying factual findings to support the § 3B1.1(a) adjustment. This argument clearly lacks merit. See United States v. Dalton, 409 F.3d 1247, 1252 (10th Cir. 2005) ("Booker therefore does not render judicial fact-finding by a preponderance of the evidence per se unconstitutional."); Magallanez, 408 F.3d at 684-85 (holding that, even after Booker, it is proper for a sentencing court to make factual findings using a preponderance of the evidence standard, so long as the guidelines are considered advisory).

*C) Reckless endangerment enhancement*

In his third argument on appeal, Wilfong contends the district court erred in imposing a two-level enhancement pursuant to U.S.S.G. § 3C1.2 for reckless endangerment based upon the fact that he and Fischer fled when police attempted to stop and detain them outside of the electronics store on January 5, 2005. Section 3C1.2 provides that "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase [the defendant's base offense level] by 2 levels." Wilfong does not dispute that the flight constituted reckless endangerment. Instead, he contends it was improper for the district court to hold him responsible for that recklessness, since he was the passenger rather than the driver of the vehicle. We "review for clear error . . . the district court's . . . determination that [Wilfong was] responsible for th[e] recklessness." United States v. Conley, 131 F.3d 1387, 1389 (10th Cir. 1997).

The Commentary to § 3C1.2 provides that "the defendant is accountable for his

-10-

own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 3C1.2, cmt., n. 5. Under Tenth Circuit case law, a district court imposing a § 3C1.2 enhancement "must make a specific finding, based on the record before it, that the defendant actively caused or procured the reckless behavior at issue." Conley, 131 F.3d at 1390. Thus, in the case of a defendant who was a passenger during a flight from police, a district court "must specify in the record its reasons for holding [that defendant] responsible for the driver's conduct." United States v. Young, 33 F.3d 31, 33 (9th Cir. 1994).

Here, the district court, during the sentencing hearing, made the following findings relevant to the reckless endangerment enhancement:

> [T]he Court finds that, based upon the evidence introduced at the trial by the Tulsa police officers, that there certainly was evidence to show that Mr. Wilfong – that this guideline calculation adjustment does apply, and that he wasn't merely a passenger but fled the store from – from the store with Ms. Fischer, and, while not a driver, actually participated in the – in the attempted getaway and the police chase which followed, and actively, while not just throwing out documents, and so forth, during the chase, which are under 3C1.1, in and of itself, would not reflect the sole reason for Mr. Wilfong's participation, but certainly gives credibility and lends credence to the application of 3C1.2 in which he was an – a participant in the police chase and the getaway attempt by Ms. Fischer and Mr. Wilfong, and so the Court finds that that two-level enhancement does apply.

ROA, Vol. 3 at 274.

These findings, though not extremely detailed, are amply supported by the record on appeal and are sufficient, in our view, to justify the reckless endangerment enhancement. During trial, the government presented the testimony of Fischer, who pled

guilty prior to trial and agreed to testify against Wilfong. Fischer testified that while she and Wilfong were being chased by police, they both "were throwing evidence out the car trying – we knew we were going to be arrested, but we were trying to get less charges." ROA, Vol. 4 at 100-01. More specifically, Fischer testified they were throwing out "[p]aperwork, numerous things" during the course of the chase. Id. at 101. Fischer's testimony was supported, in part, by that of Tulsa Police officer Todd Snedegar, who testified he was involved in the chase of Fischer and Wilfong and observed, during the course of the high speed chase, paper flying around in the air. Id. at 32. In short, it is uncontroverted that Wilfong was an active participant in the chase, i.e., he and Fischer acted together in an attempt to obstruct justice by disposing of evidence, and, accordingly, he was properly subjected to the § 3C1.2 enhancement.[1] United States v. Lugman, 130 F.3d 113, 116 (5th Cir. 1997) (affirming imposition of § 3C1.2 enhancement for reckless endangerment during flight even though defendant was not the driver of the vehicle).

*D) Criminal history calculation*

In his final issue on appeal, Wilfong contends the district court violated his Sixth Amendment rights in calculating his criminal history score. According to Wilfong, "the

---

[1] Wilfong's attempt to destroy evidence, standing alone, would not have justified an enhancement for obstruction of justice. See U.S.S.G. § 3C1.1 cmt. n.4(d) (noting that if a defendant's attempt to destroy or conceal evidence "occurred contemporaneously with arrest . . . , it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender . . . ."). That conduct, however, was relevant to establish his responsibility for the flight from police for purposes of the § 3C1.2 enhancement.

Sixth Amendment requires prior convictions to be proved to a jury beyond a reasonable doubt, or admitted by a defendant, or, in any event, proved by documentation more reliable and extensive than a simple probation report reciting what the writer of the report has learned about the defendant's prior convictions . . . ."  Aplt. Br. at 37.

Wilfong's argument is contrary to both Supreme Court and Tenth Circuit law.  In Almendarez-Torres v. United States, 523 U.S. 224, 247 (1998), the Supreme Court held that the existence of a prior conviction is merely a sentencing factor, and not a separate element of the offense that must be pled in an indictment.  In United States v. Moore, 401 F.3d 1220, 1224 (10th Cir. 2005), we held that Almendarez-Torres remains good law after Booker and notwithstanding Justice Thomas's concurring opinion in Shepard v. United States, 544 U.S. 13, 27 (2005) (Thomas, J., concurring) (stating Almendarez-Torres "has been eroded by th[e Supreme] Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that Almendarez-Torres was wrongly decided").  Thus, the district court did not err in finding the existence of Wilfong's prior convictions for purposes of calculating his criminal history score.

AFFIRMED.