TALLMAN, Circuit Judge,
concurring in part and dissenting in part:
This is a tax fraud case arising from a false declaration on a charitable organization’s tax return claiming a donation was used to purchase a mosque in Missouri when it was actually sent to terrorists in Chechnya. The conviction and sentence imposed on Pirouz Sedaghaty, also known as Pete Seda, should be affirmed. To the extent my colleagues wish to reverse the district court’s rulings and remand this case for a new trial, I respectfully dissent.[1]
Overall, the majority’s opinion fails to take into account the exemplary manner in which a seasoned trial judge handled this case to ensure that the defendant received a fair trial, despite its substantive and logistical challenges. There are several critical flaws in the majority’s analysis. First, and in contravention of the deference we owe the jury’s verdict, the opinion’s recitation of the facts is inappropriately written from the perspective of the defense theory of the case. Second, the majority unduly constricts the text of the search warrant and disregards the underlying reason for the very existence of the exclusionary rule in declaring the search unlawful. Third, the opinion disregards District Judge Michael Hogan’s express factual findings and his rulings on the potential impact of challenged witness testimony following an evidentiary hearing. And, fourth, the opinion discounts the extraordinary efforts by the Department of Justice to abide by its criminal discovery obligations and the district court’s extensive oversight of those efforts in dealing with the extremely sensitive national security concerns that underpin the investigation and prosecution of this case.
I
Contrary to the approach taken by the majority in its factual recitation, in a case involving a criminal conviction, “all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury’s verdict.” United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir.2000). Furthermore, “[t]he evidence is to be considered in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. at 1201. The jury convicted Seda after an eight-day trial and the majority opinion has failed to faithfully apply this legal principle of deference to the jury’s resolution of contested facts on appellate review. The rule respecting the jury’s fact-finding is not confined to sufficiency of the evidence challenges as posited by the majority. United States v. Kim, 25 F.3d 1426, 1432 (9th Cir.1994) (“[0]n appeal we re *919 view the factual record in the light most favorable to the verdict.”).[2]
A prime example of the majority’s slant in favor of the defense is its dismissive discussion of the government’s key evidence of Seda’s willfulness in structuring the funds transfer to hide its intended purpose.[3] The defendants’ decision to structure the transaction in the form of traveler’s checks to move the money from Oregon to Chechnya makes no sense if their intentions were benign and there was nothing to conceal. Once the Al-Hara-main Islamic Foundation, Inc. branch office based in Ashland, Oregon (Al-Hara-main-US) received the $150,000 deposit wired from London by the Egyptian donor, Dr. Mahmoud Talaat Hasan El-Fiki, defendants could have easily and quickly wire-transferred the funds to Al-Haramain Islamic Foundation, Inc.’s main office in Saudi Arabia (Al-Haramain) through international correspondent banks at a cost of about $15.
Instead, the defendants spent $1,300 in service charges to divide .$130,000 into $1,000-denomination American Express traveler’s checks that are extremely difficult to trace once cashed. To further obscure their plan they withdrew another $21,000 as a cashier’s check made payable to co-defendant, Solimán Al-Buthe, personally. Evidence showed he later deposited it in his personal bank account in Riyadh, Saudi Arabia. A reasonable jury could have concluded on this evidence that this was Al-Buthe’s “cut” for serving as the courier. ' ' •
Al-Háramain advertised more than a dozen bank accounts to collect donations, maintained a global presence in at least 50 countries, and operated with an annual budget of $30-$80 million for its charitable work. One would expect an organization of this size to keep automated banking records tracking its donations. Yet, when pressed during the investigation for documentation of the $150,000 transaction, Al-Haramain could only present through legal counsel two purported “receipts” with hand-written differing amounts for the same transaction. The government convincingly argued these documents were phony, and the district court properly admitted'them only for the limited purpose of impeachment. The jury very well could have believed from the evidence presented that the transaction was structured in this manner so that the traveler’s checks could be easily converted into untraceable cash in the Middle East with Al-Buthe taking his $21,000 for personal or nefarious use.
In addition to this evidence, the jury heard evidence of other related suspicious behavior by Seda and his confederates. Most significantly, there was the deceitful manner in which Seda hid the actual use of the $150,000 “donation” from his Oregon accountant, Tom Wilcox, by falsely claiming it was kept in the United States and *920 included in the $462,000 price of the Springfield, Missouri, mosque purchased to expand Al-Haramain-US operations. Then there is the fact that Al-Buthe properly declared the transport of negotiable instruments on nine other occasions, totaling $777,845, over a two-and-a-half-year period prior to the events in question. He filed a Currency and Monetary Instrument Report each time he traveled, but significantly did not do so when he carried the $151,000 in negotiable instruments from Oregon to Saudi Arabia.
The jury obviously thought the entire handling of the money reeked of criminal intent, as evidenced by its verdict. The complexity of the structured transactions was powerful evidence of Seda’s willfulness to hide the true use of the money from the Internal Revenue Service (IRS) when he subscribed the false non-profit tax return. Despite this laundry list of nefarious behavior, the majority fails to recognize the cumulative effect of this important evidence, which ultimately resulted in the jury’s verdict.
Aside from the financial disparities, there was other evidence introduced at trial to show Seda’s intent to lie on the tax form and hide the real purpose to which the funds were put. An incriminating email was found during the search of Seda’s residence in which Seda was communicating directly with Al-Haramain in Saudi Arabia following receipt of a battlefield report on activities in Chechnya. On January 22, 2000, just a month before the El-Fiki donation, the defendant copied into an email to co-defendant Al-Buthe a portion of a statement by Chechen commander of the Islamic Army of the Caucasus, Ibn Ul-Khattab, complaining that Islamic charities were not providing support to the mujahideen. The email contained the subject line “What Support?” Only a month later Seda received the $150,000 from El-Fiki with a notation of “Use Za-kat in order to participate in your noble support to our muslim Brothers in Chech-nia.”[4]
The jury also heard testimony from government expert witness Evan Kohlmann, who described the role of Al-Haramain in the Chechen conflict and its funding of terrorist activity under the guise of charitable donations. The “normal” process he described was that a “foreign national, in other words, a non[-]Chechen national, would travel with a suitcase of between [$] 100 and $500,000, would bring it to a country nearby to Chechnya,” and “[f]rom there the money would be couriered across the border into the Caucasus in Chechnya and be distributed to help support the mujahideen in the field.” The Al-Hara-main website also included an original copy of a fatwa[5] by Sheikh Abdallah Bin Jibrin, a senior influential cleric. It called for Muslims to “[s]upply [the mujahideen] with weapons and material support which they would utilize to struggle and fight those who fight them.” Muslims were obligated to “[s]upport [the Mujahideen] financially as they [we]re in dire need for food and clothing.”
It is not hard to see why the jury found that Seda willfully failed to disclose to the *921 IRS the trae activities of his § 501(c)(3) charitable organization when he signed the informational Form 990 tax return. The defendants’ activities and the circumstantial evidence surrounding them mirrored the modus operandi employed by those who smuggled money to Chechnya, as called upon by the fatwa announced publicly on Al-Haramain’s own website. Coupled with incriminating computer evidence recovered by forensic examiners from his deleted hard drives, the jury could reasonably infer that Seda was well aware of the intended recipient’s use for any donations from Al-Haramain-US.
II
The incriminating evidence seized from Seda’s Ashland prayer house properly fell within the scope of the search warrant. On behalf of the defense, the majority opinion manufactures its argument to limit the scope of the search. We agree that Seda’s steadfast argument advanced in his briefs—that the affidavit was not incorporated—is untenable. However, the majority’s newly created argument invalidating the search is also flawed. First, it refuses to acknowledge that when properly read as a whole the warrant’s language allowed for the collection of the records seized. And, second, even if the agents exceeded the intended scope of the search warrant, the exclusionary rule should not bar the use of the collected evidence based on the good faith exception.
A
The search warrant described the “ITEMS TO BE SEIZED” as all “[r]ecords and communications” to include all “[e]vidence concerning the subscription to a false Form 990 Tax Return, in violation of 26 U.S.C. § 7206(1), as described in the attached affidavit, for the year 2000.” (emphasis added). Records and communications were defined as “electronic records and communications involving the individuals or entities” associated with the violations. The subjects of the search warrant included the two defendants, two other known Al-Haramain officials, the donor -of the money ultimately delivered to the Chechen mujahideen, as well as five related Al-Haramain entities. Furthermore, the search warrant defined a careful procedure to search computers for all “records stored or modified in any form.” If during the search the law enforcement computer personnel determined it was not practical to complete the search of the computers on-site, then the computers could be “seized and transported to an appropriate law enforcement [forensic] laboratory for review.”
The difference in the way the majority approaches the search warrant inquiry reflects a fundamental difference in our views of how searching agents are guided by the court’s authorization of items to be seized in light of the more detailed statements in the incorporated (and physically present) affidavit of facts establishing probable cause for its issuance. The majority focuses upon the words “limited to the following”- while ignoring the 33 pages of detail outlining the multi-year joint FBI/ IRS/ICE investigation “as described in the attached affidavit” incorporated by reference.
“The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect’s possession.” Andresen v. Maryland, 427 U.S. 463, 480 n. 10, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). A search warrant may include a class of generic items or goods to be searched, as it did here, “if there are objective, articulated standards *922 for the executing officers to distinguish between property legally possessed and that which is not.” United States v. Hill-yard, 677 F.2d 1336, 1340 (9th Cir.1982). “The standards may be contained in the search warrant or ... in the accompanying affidavit” if properly incorporated. Id.
Seda does not challenge the sufficiency of the showing of probable cause to support issuance of the warrant. And once armed with the court’s authority to search the Ashland premises utilized by the subjects of the investigation, agents were certainly entitled to seize items of obvious evidentiary significance to that investigation as detailed in the accompanying statement of probable cause. In short, there is no requirement in law that limits items to be seized solely to those expressly listed in the search warrant. The overarching Fourth Amendment principle is, as set forth in this dissent, one of “reasonableness” under the totality. of the circumstances. See United States v. VillamonteMarquez, 462 U.S. 579, 588, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983).
1
To determine whether the seized items fell within the scope of the search warrant, it is important to consider the mens rea the government is required to prove beyond a reasonable doubt in this type of case. The statutory language of 26 U.S.C. § 7206 requires that a person willfully completes and signs a tax return that the person “does not believe to be true and correct as to every matter.” In order to establish the mens rea that Seda “willfully” filed a false tax return, the government needed to explain the context in which he directed his accountant to prepare the 2000 tax return for his organization. The government knew when requesting the search warrant that gathering evidence to show why Seda wanted to hide the true use of the donation was an important element of their case. Why else would Seda and his confederates have structured their transactions in such deceitful ways?
To that end, the search warrant incorporated by reference and the magistrate reviewed an affidavit with background materials describing the probable cause related to the El-Fiki payment to Al-Haramain in support of the armed conflict in Chechnya. The affidavit includes more than five pages of sworn testimony by the case agent[6] specifically attesting to the connections between Seda, Al-Haramain, the Chechen conflict, donations, and mujahideen military forces. The materials collected by the government were relevant to these topics and helped establish the necessary mens rea for conviction. Although the majority argues that no'“hypertechnical parsing of the language” of the search warrant affidavit is required, to interpret it as my colleagues suggest renders a large portion of the affidavit superfluous.
As suspected and later confirmed by the excessive quantity of materials found in his possession, Seda had an obsessive interest in Chechnya and the armed forces involved in the conflict. The seized materials supported the government’s contention that Seda’s zealous interest rose to a level that compelled him to send money to aid the struggle, which then drove him to falsify the non-profit tax return to cover up his support. The majority’s benevolent characterization of the evidence as “Seda’s internet browsing of religious web sites” or “correspondence with friends and co-workers,” overlooks the fact that these web *923 sites and listserv emails encouraged a call to arms and corroborated the description of Al-Haramain and its terrorist activities in the affidavit. Judge Hogan’s factual determinations regarding the express terms of the search warrant and incorporated affidavit were not clearly erroneous. United States v. Giberson, 527 F.3d 882, 886 (9th Cir.2008) (“We review ... the district court’s underlying factual findings for clear error.”).
The majority’s concern regarding the scope of the search is unfounded, and even my colleagues agree that the warrant actually incorporated the case agent’s sworn affidavit. We have held that:
[t]he warrant requirement is a means of preventing arbitrary and unreasonable invasions of privacy; the search warrant itself is the tangible evidence that precautions have been taken to ensure that no such invasion has occurred. When the officer who requests authorization for the search, the magistrate who grants such authorization, and the officers who execute the search expressly rely upon a given set of papers containing a given series of words, they identify that set of papers and that series of words as the proof that proper precautions were taken to prevent an unreasonably invasive search.
United States v. Towne, 997 F.2d 537, 548 (9th Cir.1993).
It is a “well-settled principle that "a warrant’s overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized.” Id. at 544 (citing United States v. Luk, 859 F.2d 667, 676 (9th Cir.1988)). An affidavit is “part of a warrant, and therefore potentially curative of any defects, ... if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search.” United States v. SDI Future Health Inc., 568 F.3d 684, 699 (9th Cir.2009). “When we say that a warrant may be so facially deficient that it precludes reasonable reliance, what we mean is that ‘[ojfficers poised to conduct a search should be able to ascertain that such a warrant fails to offer sufficiently detailed instruction and instead leaves them guessing as to their task.’ ” Towne, 997 F.2d at 549 (quoting Ortiz v. Van Auken, 887 F.2d 1366, 1370 (9th Cir.1989)).
The majority mischaracterizes the warrant as underinclusive and then determines that an affidavit cannot be read to broaden the scope of the warrant. However, if these documents are correctly read, this argument fails. The warrant in this case is not underinclusive. It broadly allows for the collection of all evidence related to the preparation of a false tax return. It is the affidavit that then zeros in on the evidence the investigation had already uncovered related to Al-Haramain and its connections to funding the mujahideen’s activities in Chechnya. The affidavit appropriately narrowed the search to these activities, the underlying reason why Seda falsified the Al-Haramain-US’s tax return. Just as described in Luk, supra, the appropriately incorporated affidavit “cured” any potential overbreadth of the warrant, and the majority’s argument collapses.
2
The government went to great pains to comply with the limitations of the warrant. Before giving his independent approval, United States Magistrate Judge John Coo-ney read the search warrant, supporting attachments, and the case agent’s sworn affidavit, incorporated by reference. Prior to conducting the search, the prosecution and the case agent developed a search procedure to be followed with a designated seizing officer and computer-search proto *924 col. The case agent briefed the nearly 20 agents on site and gave each agent a copy of the search warrant to read.[7] All of the search warrant documents were available on site for further reference during the search. Seda’s personal attorney also reviewed the search warrant and affidavit when he was summoned to the property by Seda’s son. The case agent consulted throughout the search with the prosecutor for legal guidance regarding the seizure of particular items. Some documents were seized only after Seda’s son .talked with Seda’s attorney on site and gave voluntary consent.
The majority’s concerns regarding a “kitchen sink” affidavit and the possible dangers of coming across papers not authorized by the search are misguided. My colleagues barely acknowledge the extensive forensic reconstruction required to salvage any usable evidence from the deleted hard drives. The investigation then employed an independent taint team, unrelated to this investigation, to sift through the electronic materials gained from the search and distinguish between those that were within the scope of the search, and those that were not. The case agent developed specific search terms in conjunction with forensic examiners to cull the relevant data and focus on the individuals and items listed in the affidavit of probable cause. When the computer search revealed evidence ■ of an unrelated crime, agents immediately sought and obtained a second search warrant.
3
Additionally, the district court conducted an evidentiary hearing on this issue, and Judge Hogan specifically found that the search was reasonable and that agents faithfully followed the issuing magistrate judge’s directions in conducting the computer searches, employing appropriate protocols. The district judge concluded that “the warrant, including the affidavit incorporated into the warrant, was reasonably specific as to the items sought and the government followed appropriate protocols to separate intermingled materials.” And, “[t]he crimes charged require proof of intent and thus records beyond simple financial records were appropriately seized, such as evidence of support of the efforts of the Chechnyan [Chechen] mujahideen.” Furthermore, Judge Hogan determined that “[g]iven the nature of the data and the fact that it had been deleted, the ae- *925 tions taken by the government were reasonable and permitted by the warrant as approved by Magistrate Cooney.” We must defer to factual findings unless they are clearly erroneous. Giberson, 527 F.3d at 886.
4
The seized inculpatory evidence did not exceed the scope of the search warrant. The majority’s reliance on Doe v. Groody, 361 F.3d 232 (3d. Cir.2004), is misplaced and easily distinguishable when the search warrant is considered in conjunction with the incorporated affidavit. Based on Groody, the majority states that “an affidavit cannot be relied upon to authorize a search beyond the scope of a judicially authorized warrant.” See id. at 241.
However, the search in Groody exceeded the scope because the warrant failed to incorporate the affidavit. Id. at 236, 239-41. This detail, disregarded by the majority, drove the Third Circuit’s entire analysis. It is simple logic that when an affidavit is not incorporated then law enforcement is precluded from relying upon it and to do so would exceed the scope of the warrant. As noted in that decision, “[wjere we to adopt the officers’ approach to warrant interpretation, and allow an unincorporated affidavit to expand the authorization of the warrant, we would come dangerously close to, displacing the critical role of the independent magistrate.” Id. at 241.
But here, the majority agrees that the affidavit was incorporated, and it was available during the search to guide the agents executing the warrant. This undermines any application of the Groody decision to this case. The critical role of the neutral and detached magistrate was not displaced. Because the scope of the search was permitted under the warrant and was reasonable -on the facts of the case, there was no Fourth Amendment violation. See Michigan v. Fisher, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (“[T]he ultimate touchstone of the Fourth. Amendment ... is ‘reasonableness.’ ”).
The majority’s reliance on United States v. Kaye, 432 F.2d 647 (D.C.Cir.1970), and United States v. Angelos, 433 F.3d 738, 746 (10th Cir.2006), also misses the mark. In both of the cases the issue on appeal was whether law enforcement searched a permissible location, such as Kay’s upstairs apartment which had a “separate and distinct” entrance and a different street address than the one listed on the warrant. Kaye, 432 F.2d at 649. The express language of the warrant in Kaye only included the location of the search as 3618 14th Street, whereas the apartment’s actual address was 3618)614th Street. Id. at 648^49. The affidavit included a reference to the “entire premises” of “a two story brick building” at “3618 14th Street.” Id. át 649. On appeal, the court held that based on the facts of that case, “the description in the search warrant, not the language of the affidavit ... determined] the place to be searched.” Id. In Angelos, the Tenth Circuit held the officers exceeded the scope of the warrant where the listed search location on the face of the warrant was a safe and a car, but officers additionally searched the entire home based on two references to the “residence/premises” made in the affidavit. 433 F.3d at 745-46.
First, these cases are not applicable because this case is not about an incorrect search location. Here, the agents dutifully searched the appropriate premises and received consent to extend the search to trailers not included in the description of places to be searched in Attachment “A.” It is telling that these are the best cases the majority can find to make their argu *926 ment. There are no cases on point denying that an affidavit can be used to clarify and narrow the warrant when it comes to determining which evidence may be seized.
And, second, as previously discussed, the majority’s argument that the affidavit in this case expanded the scope of the warrant is a mischaracterization. The affidavit appropriately limited the warrant to the focused evidence described therein. Furthermore, although the majority attempts to analogize searching an incorrect location to seizing items outside the scope, that gloss ignores the inherent difference between these two elements of the Fourth Amendment. A particularized location is a requisite element for a reasonable search. Regardless of the items seized, law enforcement must first be at the right location. Location is a finite concept, whereas the search warrant’s description of all “[ejvidence concerning the subscription to a false Form 990 Tax Return, in violation of 26 U.S.C. § 7206” requires factual context, the role of the affidavit. The analysis from these cases is not an apples to apples comparison, and it cannot be extended to cover the search here. At bottom, the evidence was appropriately seized because, just as Judge Hogan found, the warrant combined with the affidavit authorized the collection of evidence indicative of Seda’s willful intent to falsify the Al-Haramain-US tax return.
B
But, even if the majority is correct in finding that the search exceeded the scope of the warrant, under the good faith exception recognized by the Supreme Court in Leon and Herring, suppression would not serve the purpose of deterrence. See United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). “Suppression of evidence ... has always been our last resort, not our first impulse.” Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). The Supreme Court has rejected reflexive application of the exclusionary rule. Id. “[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.” Herring, 555 U.S. at 144, 129 S.Ct. 695. There is no evidence of any such misconduct here. “Whether the exclusionary sanction is appropriately imposed in a particular case ... is ‘an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.’” Leon, 468 U.S. at 906, 104 S.Ct. 3405 (quoting Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). “[T]he exclusionary rule has never been applied except where its deterrence benefits outweigh its substantial social costs.” Hudson, 547 U.S. at 594, 126 S.Ct. 2159 (internal quotation marks omitted).
Here, the balance weighs strongly in favor of not applying the exclusionary rule. “[Wjhen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system.” Leon, 468 U.S. at 908, 104 S.Ct. 3405. The government went to great lengths to conduct a reasonable search. The search warrant incorporated a lengthy affidavit for the magistrate’s review. There was an established on-site search procedure and computer search protocol with defined search terms. The case agent consulted with the prosecutor throughout the execution of the warrant to make sure the search was appropriately conducted. The exclusion of *927 evidence in this case would not serve to deter misconduct in the future where every indication was that law enforcement agents complied with the scope of the search warrant. Agents acted in good faith under Leon and Herring, and accordingly, exclusion is not warranted.
Ill
Judge Hogan conducted a full evidentiary hearing to consider the proposed impeachment evidence regarding Barbara Cabral discovered after trial. We should defer to the district court’s factual findings, which were not clearly erroneous, in upholding his legal determination that the undisclosed evidence was not material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The majority applies complete de novo review to the three-step inquiry and fails to give the appropriate level of deference we owe the trial court. Unlike here, for its standard of review, the majority relies upon a case that did not involve an evidentiary hearing regarding the Brady violation. United States v. Pelisamen, 641 F.3d 399 (9th Cir.2011); see also United States v. Howell, 231 F.3d 615 (9th Cir.2000).
This procedural difference is telling. As we noted in United States v. Price, “[wjhile it is clear that the legal questions at issue in a Brady claim are reviewed de novo, this circuit has not yet ‘had the opportunity to consider what, if any deference should be afforded to a district court’s factual findings....’” 566 F.3d 900, 907 n. 6 (9th Cir.2009) (citing United States v. Jernigan, 492 F.3d 1050, 1062 (9th Cir.2007) (en banc) (Bea, J. dissenting)). In Price, we avoided this open question because the judge ruled on the motion for a new trial from the bench. Id. However, in this case Judge Hogan denied Seda’s motion for a new trial in a written order with express factual findings after taking testimony in both written and oral form and holding an in camera hearing. These facts- cannot be ignored on appellate review.
We should follow the First, Second, Third, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits and the United States Court-of Appeals for the District of Columbia, all of whom have recognized this difference in procedural -posture and given the requisite deference to the trial court’s factual findings on appeal. Jemigan, 492 F.3d at 1062, 1062-64 (Bea, J., dissenting) (citing and discussing each case). This is because although legal issues are analyzed de novo, “a Brady determination is inevitably a contextual inquiry, involving questions of both law and fact.” United States v. Sipe, 388 F.3d 471, 479 (5th Cir.2004). Our sister circuits apply appellate deference to a district court’s factual findings bearing on Brady materiality, and recognize that the trial judge—who listened to the witnesses, heard their testimony, and watched as they gave it—is in a far superi- or position to assess materiality than we are on a cold record. United States v. Boyd, 55 F.3d 239, 242 (7th Cir.1995).
The Brady analysis depends on “nested” factual determinations which strongly influence the legal determination. See United States v. Sanchez, 917 F.2d 607, 618 (1st Cir.1990); United States v. Thornton, 1 F.3d 149, 158 (3d Cir.1993). The correct standard of review must be applied to each step of the analysis. In this case Judge Hogan necessarily had to analyze: (1) the impact of the undisclosed impeachment evidence specifically on Cabral’s overall testimony; (2) the impact, if 'any, of that determination on all the other evidence presented in the case (28 out of 1,800 pages of trial testimony); and (3) whether it was significant enough to undermine our confidence in the outcome of the jury’s verdict. Thus, while question *928 three is a legal question subject to de novo review, questions one and two are inherently factual determinations that require our deference unless they are clearly erroneous. To rule otherwise would amount to appellate fact-finding. Jemigan, 492 F.3d at 1059 (Bea, J., dissenting).
Accordingly, after conducting an in camera proceeding to review the contested evidence and taking evidence from various witnesses, including Barbara Cabral, Judge Hogan properly determined that the withheld information did not violate the standard of United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). “Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Id.
Brady requires the disclosure of evidence only if it is “both favorable to the accused and ‘material either to guilt or to punishment.’ ” Id. at 674, 105 S.Ct. 3375 (quoting Brady, 373 U.S. at 87, 83 S.Ct. 1194). A prosecutor only violates a “constitutional duty of disclosure” where the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). While the government admits it erred by not turning over possible impeachment evidence related to the testimony of Barbara Cabral, when the district court’s factual findings are considered, within the context of the eight-day trial as a whole, Judge Hogan correctly determined that the withheld information did not rise to a level that deprived Seda of a fair trial.
On March 17, 2010, well before commencement of trial on August 30, 2010, the United States disclosed Barbara Cabral as a witness who would “testify a[b]out observations made while attending functions at the Al-Haramain Islamic Foundation, Inc. in Ashland, Oregon.” The most damaging testimony she offered was that at the conclusion of the Hajj in the Spring of 1999, while she, Seda, and others were in Saudi Arabia traveling on money provided by Al-Haramain, Seda collected $200 from each group members’ remaining funds for blankets and food for Chechen freedom fighters. The evidence was only circumstantially relevant since El-Fiki did not make his $150,000 “donation” until nearly a year later. The disputed tax return for Al-Haramain-US, which misstated how those funds were actually used, .was not filed until October 2001, more than 18 months after the Hajj.
The defense claims that the government’s failure to disclose information regarding Barbara Cabral warrants a new trial under Brady and Bagley. But the district court held an evidentiary hearing on this issue and entered findings of fact adverse to the defense position:
Indeed, of the 1800 page transcript generated from the trial, Barbara Cabral’s testimony takes up only 28 of those pages. She was aggressively cross-examined. There was some significance to the terrorist issue because the government ostensibly wanted to establish a reason for the tax fraud. But Cabral’s testimony was immaterial to the jury’s convictions on the charges presented because it did not matter where the money fraudulently reported on the tax return actually went and because of other significant evidence regarding willfulness. The government’s case centered on the accountant, Thomas Wilcox’s testimony. The government’s focus on the issues surrounding the mujahideen has a greater relation to any enhancement during the sentencing phase. The materiality of Cabral’s testimony to that question is a little more clear given that this was *929 really the only direct evidence about defendant’s desire to fund the mujahideen.
Ultimately, Judge Hogan chose not to impose the sentencing enhancement for terrorism to which Cabral’s testimony was relevant. U.S.S.G. § 3A1.4(a).
Also, relevant to willfulness, there was other significant, independent ■ evidence supporting the jury’s finding. Daveed Gartenstein-Ross, a former employee of Al-Haramain-US, independently testified that Seda talked about gathering money for mujahideen forces in Kosovo. There was ample evidence in the record from emails and other items seized from Seda’s computers at the Ashland prayer house that showed his intent to covertly support the mujahideen in Chechnya, including visits to multiple Jihadi web sites, a pro-Chechen mujahideen listserv, and battlefield photographs of the mujahideen. The government obtained still photos from Seda’s home taken from a mujahideen fundraising video showing a training camp, as well as other seized items, with the consent of defendant’s son, whose counsel was present during the search. The jury heard background expert testimony about the Chechen conflict and the relationship between Al-Haramain, the Saudi Joint Relief Committee, and support for the muja-hideen.
Most damning, the jury was certainly entitled to infer from the deletion of the computer hard drives that Seda acted with criminal intent. Experienced prosecutors, criminal defense lawyers, and judges know that juries give heightened weight to a suspect’s efforts to destroy or secrete incriminating evidence. Seda had ample notice since 2001 that he was under investigation prior to execution of the search warrant in February 2004. When agents seized his computers three years into the investigation, they discovered that the hard drives had been deleted. It was only through forensic computer examination that the government was able to laboriously restore the incriminating information and piece together ■ the' inculpatory evidence in this case.
Given the quantity of alternative, independent evidence, and when considered cumulatively, it is unlikely that the failure-to disclose the payments to Cabral’s husband, Richard, and the interview notes, which arguably might have impeached her testimony, materially prejudiced the defense. As Judge Hogan, who presided over the trial, so found.
The majority opinion’s reference to discrepancies in the interview notes of Richard Cabral are irrelevant. Because he passed away during the investigation of this case and was therefore unavailable during trial for cross-examination, any relevant statements he made during the investigation would have been inadmissible under Federal Rule of Evidence 802 as hearsay within hearsay, not subject to an exception.
The district court’s factual findings are not clearly erroneous, and the majority errs in failing to give appropriate deference. Judge Hogan correctly determined that the error was not so substantially injurious as to warrant a new trial because the result would have been no different. See Bagley, 473 U.S. at 682, 105 S.Ct. 3375. The jury could easily have reached the same conclusion without even considering Barbara Cabral’s testimony and accordingly its exclusion did not serve to undermine confidence in the outcome of the trial.
IV[8]
Contrary to the majority’s ruling, the unclassified summary complied with the *930 requirements of the Classified Information Procedures Act (CIPA). 18 U.S.C. app. 3, § 4. The law permits the creation of an unclassified summary report or substitution of a statement admitting relevant facts helpful to the defense in lieu of disclosing state secrets. Id. The government has the burden under Federal Rule of Criminal Procedure 16 to disclose evidence “both favorable to the accused and material either to guilt or to punishment.” Bag-ley, 473 U.S. at 674, 105 S.Ct. 3375 (citing Brady, 373 U.S. at 87, 83 S.Ct. 1194). CIPA authorizes the government to submit an ex parte motion to the district court to reveal that it is in possession of relevant documents and to conduct in camera proceedings ex parte where classified information responsive to this obligation exists. 18 U.S.C. app. 3, § 6.
This left the government and the court in the awkward position of having to sift through classified documents from the intelligence community to try to determine if any contained exculpatory information helpful to Seda’s defense. United States v. Amawi, 695 F.3d 457, 471 (6th Cir.2012) (“Rather than neutrally deciding disputes with an open record based on the adversarial process, [the court] must place [itself] in the shoes of the defense counsel, the very ones who cannot see the classified record, and act with a view to their interests.”); see also United States v. Mejia, 448 F.3d 436, 458 (D.C.Cir.2006) (noting the difficult predicament of “the defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, [but] are disadvantaged by not being permitted to see the information and ... assist the court in its assessment of the information’s helpfulness”). The court must determine whether there is exculpatory material and whether an unclassified summary or statement of admitted facts can be crafted to effectively substitute for production of the documents themselves, which cannot be disclosed for reasons of national security. 18 U.S.C. app. 3 § 4.
The unclassified summary report given to Seda 18 months before trial complied with the requirements of CIPA as defined in § 6(c)(1). “The district court must accept [the substitution] if it will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information.” United States v. Moussaoui, 382 F.3d 453, 477 (4th Cir.2004) (internal quotation marks omitted). There was no abuse of discretion here because the court provided the defense with all the necessary details from the withheld documents to follow any potential investigative leads.
The underlying documents themselves were inadmissible- under Federal Rule of Evidence 802 as hearsay within hearsay, not subject to an exception. The court issued letters rogatory submitted by the defense asking the Kingdom of Saudi Arabia for access to Sami Al-Sanad, the subject of the summary document substitution, while he was in its custody. The defense had already interviewed Solimán Al-Buthe, the other individual named in the summary, on multiple occasions, while ironically the prosecution was refused official access to interview any Saudi citizens.
The defense objected to the introduction of the government’s summary, but it offers no explanation for not proposing a stipulation in slightly revised form so as to get before the jury Al-Sanad’s claim that the money was to be used for legitimate humanitarian purposes in Chechnya. The defense initially marked the summary as *931 Defense Exhibit 730, but then just ten days before trial raised its first concern regarding its contents. In a hearing seven days later, Judge Hogan stated, “I want to look at that again.” Defense counsel reiterated his concern regarding the summary, but in the same hearing and prior to Judge Hogan ruling on the objection, defense counsel withdrew the exhibit. At trial, the defense team did not renew the objection to the unclassified summary.
An issue is preserved for appeal “where the substance of an objection has been thoroughly explored and the trial court’s ruling was explicit and definitive.” United States v. Palmer, 3 F.3d 300, 304 (9th Cir.1993). Although “there is no requirement that a party engage in a futile and formalistic ritual to preserve the issue for appeal,” that is not this case. United States v. Varela-Rimra, 279 F.3d 1174, 1177-78 (9th Cir.2002).
The summary had been provided to the defense with sufficient time to litigate over its contents. The defense team never offered an alternative version to the trial court for consideration as a possible compromise.[9] The defense team did not afford Judge Hogan an opportunity to make an “explicit and definitive” ruling on its objection prior to withdrawing the exhibit. Nor did the defense team reiterate its objection at trial to preserve the issue on appeal.
By failing to offer an acceptable alternative, failing to seek an “explicit and definitive” ruling on the objection, failing to object to the summary’s language at trial, and choosing to withdraw the exhibit prior to trial, Seda waived any challenge to this claim. Deference is owed to defense counsel’s trial strategy, and we cannot speculate now after the jury has spoken as to why defense counsel chose not to pursue their objection further, nor offer the exhibit at trial. We should not countenance this tactical maneuver on appeal where Seda waived any objection by failing to preserve it at trial.
Judge Hogan went to extraordinary lengths to conduct multiple in camera proceedings and appropriately review related classified information in an effort to meet the commands of CIPA. There was no abuse of discretion in the court’s authorization of the substituted summary, but because of the waiver, we should not even reach this issue.
V
A capable district court judge had a daunting task in overseeing this complex case, and the record shows he fairly balanced the competing interests at stake. The search did not exceed the scope of the properly authorized warrant and its incorporated affidavit. The procedures employed in its creation and execution were measured and appropriate. The district court’s factual findings were not clearly erroneous, and the determination that the potential impeachment evidence regarding Barbara Cabral did not warrant a new trial was correct. The unclassified summary appropriately complied with the requirements of CIPA and balanced the need to protect national security with Seda’s right to present a defense. Under these difficult circumstances, Seda got a “fair trial,” even though it might not have been a “perfect one.” Ross v. Oklahoma, 487 U.S. 81, 91, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). For these reasons, I *932 would affirm the conviction and the trial court’s rulings.

. Readers of this opinion should be cautioned that to completely understand my analysis requires the necessary security clearance to review the classified portion of this dissent, contemporaneously filed under seal in the custody of the Classified Information Security Officer.

. The majority implies that our court must only view the facts in the light most favorable to the jury verdict when the defendant has challenged the sufficiency of the evidence. This is not only wrong, see SEC v. Jasper, 678 F.3d 1116, 1120 (9th Cir.2012) (stating that "[w]e relate the facts here in the way most favorable to the jury verdict” even though sufficiency of the evidence was not raised on appeal), but it defies logic. When a jury reaches a verdict on any issue, we must respect the facts the jury necessarily found to reach that verdict. That prerogative is even stronger when, as here, the defendant acknowledged that the evidence supports the verdict by opting not to challenge the evidence’s sufficiency.

. The charge that Seda was ultimately convicted of, filing a fraudulent tax return under 26 U.S.C. § 7206, requires that a violator “■willfully makes and subscribes any return, statement or other document ... not believe[d] to be true and correct as to every matter.” (emphasis added).

. Zakat is one of the pillars of Islam and is the giving of obligatory alms or charity, similar to a tithe. “Zakat means to provide charity to suffering Muslims,” which some interpret to include “distribut[ion] to Muslim fighters who are fighting a larger opponent,” like the Chechen mujahideen at war with the Russian army.

. A fatwa issued by a cleric "is the equivalent of a ruling on a particular issue regarding Islam or Muslims, and it is incumbent upon anyone who follows the person issuing the fatwa to follow the advice given.”

. The IRS case agent in charge of the Seda investigation was IRS Special Agent Colleen Anderson.

. Because the case agent was both the affiant and led the execution of the search warrant, any concerns regarding the seizures should be foreclosed. As noted by the Tenth Circuit:
[fit would be anomalous to permit an officer’s knowledge of the terms of the affidavit to cure a lack of particularity on the face of a warrant but not permit the officer’s knowledge to clarify the practical meaning of a term in a facially valid warrant. Because an affidavit can be used to demonstrate that a warrant is not constitutionally invalid for lack of particularity when the same officer produces the affidavit and executes the warrant, an affidavit also may be used to clarify with 'practical accuracy’ the meaning of a disputed term in a warrant when the same person is both affiant and executing officer.
United States v. Ortega-Jimenez, 232 F.3d 1325, 1329 (10th Cir.2000); see also Massachusetts v. Sheppard, 468 U.S. 981, 989 n. 6, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) ("the officer who [wrote the affidavit and] directed the search, knew what items were listed in the affidavit presented to the judge, and he had good reason to believe the warrant authorized the seizure of those items.”); United States v. Durk, 149 F.3d 464, 466 (6th Cir. 1998) (recognizing that where the same officer applies for and executes the warrant, a mistaken search is unlikely); United States v. Beaumont, 972 F.2d 553, 562 (5th Cir.1992) (relying on the executing officer as the affiant for support in upholding particularity of the warrant).

. The analysis in the unclassified dissent is constrained to a discussion of only unclassi *930 fied evidence. A more complete analysis of the substitution is included in the classified dissent under the protection of the Classified Information Security Officer.

. The majority argues that defense counsel was not in the position to offer alternative language. However, ten days before trial, defense counsel could certainly have brought the court’s attention to the specific words which it considered “editorialized” and recommended less pejorative alternatives.